UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

INGENUITY, INC.,

          Plaintiff,

v.                                  Case No:  6:11-cv-93-Orl-28KRS

LINSHELL INNOVATIONS LIMITED and
CONAIR CORPORATION,

          Defendants.

---

## ORDER AND NOTICE OF HEARING

This case involves a dispute about the right to distribute hairclips made by Linshell Innovations Limited.  Linshell entered into a contract with Ingenuity, Inc., giving Ingenuity the exclusive right to distribute one of its products known as the Linziclip.  When Ingenuity failed to meet its sales goals as provided in the contract, Linshell terminated the agreement with Ingenuity and entered into a contract with Conair Corporation, making Conair the exclusive distributor of the Linziclip.  Ingenuity sued Linshell and Conair on various grounds.  Conair now moves for summary judgment on Ingenuity's claims against it—tortious interference with a contract, tortious interference with business relationships, and breach of contract.  Because no genuine disputes of material fact remain, Conair's motion for summary judgment (Doc. 221) must be granted.

I.     Background

Linshell is a hair accessory company primarily owned and operated by Lindsey Walker and Shelley-Anne Salisbury. (Walker Dep. at 88-99; <u>see also</u> Walmsley Dep. I at

40-41).[1]  Linshell manufactures the Linziclip, a hairclip designed by Ms. Walker.  As the result of Linshell's search for a distributor for the Linziclip, (Walker Dep. at 111-12), Ms. Walker and Ms. Salisbury met with Leslie Martin and Scott Walmsley about distribution opportunities, (Walker Dep. at 124-25; Martin Dep. at 41-42).  Subsequently, Mr. Martin and Mr. Walmsley decided to form Ingenuity to distribute the Linziclip.  (See Walmsley Aff., Doc. 263-1, at 5; Martin Dep. at 42).

On December 22, 2003, Linshell and Ingenuity entered into a Distribution Agreement (Ex. A to Conair's First Req. for Admiss., Doc. 230-2, at 7-47), which made Ingenuity the exclusive distributor of the Linziclip in particular geographic areas, including the United States, (id. §§ 1.1 & 2.1).  The agreement provided that eighteen months after Ingenuity ordered its first batch of Linziclips, it would have the automatic right to extend its distribution territory to China and Hong Kong.  (Id. § 3.1). The Distribution Agreement specified annual and aggregate targets that set forth the requisite numbers of clips for Ingenuity to purchase, (id. § 4 & Schedule 1); if there was a shortfall from the targets in any year, Ingenuity could either carry forward the shortfall to the next year, provided it met the aggregate targets at the end of that year, or apply previous purchase excesses to the current year's shortfall, (id. §§ 4.2.1 & 4.2.2).  The Distribution Agreement also provided

---

[1] Citations to depositions are indicated by "[Last Name] Dep."  The page numbers refer to the individual page of the deposition transcript, not the page of the document on the docket.

The record contains three depositions of Scott Walmsley along with exhibits, and citations to Mr. Walmsley's depositions are as follows.  The May 28, 2013 deposition is Walmsley Dep. I.  (Docs. 230-4; 230-5; 230-6; & 230-7).  The May 29, 2013 deposition is Walmsley Dep. II.  (Docs. 231-1; 231-2; 231-3; & 231-4).  The October 24, 2013 deposition is Walmsley Dep. III.  (Docs. 231-5; 231-6; & 231-7).  The deposition, including exhibits, of Lindsey Walker can be found at Docs. 232-5; 232-6; 232-7; and 232-8.  The deposition, including exhibits, of Leslie Martin can be found at Docs. 232-3 and 232-4.

that the initial term of the agreement was five years and would automatically renew every five years thereafter, (id. §§ 1.1 & 16.1), but that Linshell was entitled to terminate the agreement if, among other reasons, Ingenuity failed to meet the annual targets, (id. § 16.2). And, if at the end of any year Ingenuity had not met the targets, it could make a payment to Linshell to make up the shortfall. (Id. § 4.3). If Ingenuity failed to make such a reset payment in a year it missed a target, it would "automatically cease to be the exclusive distributor" of the Linziclips, unless notified by Linshell that their relationship would continue to be exclusive. (Id. § 4.4). Once the contract became non-exclusive, most of its other terms would continue to be binding for eighteen months. (Id. § 4.5).

In June 2006, Ingenuity approached Conair about a potential arrangement in which Conair would become Ingenuity's subdistributor of the Linziclip. (Diamond Aff., Doc. 230-1, ¶ 3; Walmsley Dep. I at 56-61). Ingenuity and Conair discussed this possibility but evidently did not enter into a signed, written agreement. (See Diamond Aff. ¶ 7; Walmsley Dep. II at 394-405). Ingenuity and Conair did, however, sign an Undertaking of Non-Disclosure (Doc. 271-1) to protect information about the Linziclip that Ingenuity might disclose to Conair. (Diamond Aff. ¶ 4). Mr. Walmsley testified that Ingenuity had counted on being able to use a subdistributor in entering into the distribution agreement, (Walmsley Dep. I at 102), but he admitted that Ingenuity could not select a subdistributor under the Distribution Agreement without the consent of Linshell, (id. at 105). Ingenuity informed Linshell that it was attempting to find a subdistributor, but it did not disclose that it was negotiating with Conair for this purpose until a later date. (See, e.g., Walmsley Dep. II at 410 & Ex. 27 to Walmsley Dep. II; Walker Dep. at 157). Based on previous negative experiences, Ms. Walker initially preferred that Ingenuity not work with Conair. (Walker

3

Dep. at 155). While Ingenuity alleges that Linshell adamantly prohibited it from working with Conair, (Walmsley Dep. I at 108), Ms. Walker states that she changed her mind quickly and permitted the two companies to work together, (see Walker Dep. at 155-56).

By at least May 2007, Linshell and Ingenuity's relationship had become rocky. (See, e.g., Walmsley Dep. I at 148-49; Exs. 8 & 9 to Walmsley Dep. I, Doc. 230-7, at 3-11). Ingenuity had failed to meet the targets specified in the Distribution Agreement, (see, e.g., Walmsley Dep. I at 120-21 & 131-32), and declined to carry forward the shortfall or make the reset payments, (id. at 132-33).   Ingenuity admits that it was unable to meet these targets but blames Linshell for its failure, contending that Linshell had production problems, resisted Ingenuity's efforts to distribute the product in China, and frustrated Ingenuity's attempt to enter into a subdistribution agreement with Conair. (See Walmsley Aff. at 9-11; Compl. ¶¶ 36, 44, & 46). According to Ingenuity, these problems led to oral modification of the Distribution Agreement, allowing for lower targets. (Walmsley Dep. I at 43 & 121).[2] Linshell disagrees, maintaining that the contract targets were not modified and that the Distribution Agreement became non-exclusive in March 2007, due to Ingenuity's failure to meet the targets. (See Walker Dep. at 185-96). Ingenuity disputes that the contract ever became non-exclusive. (See Summ. J. Resp., Doc. 237, at 10 (maintaining that Ingenuity had "perpetual exclusive rights" to distribute the Linziclip)).

The facts and legal repercussions following Ingenuity's failure to meet the targets set forth in the Distribution Agreement are disputed, but the parties agree that on August

---

[2] Mr. Walmsley testified to the existence of a written document that reduced the target numbers, (Walmsley Dep. I at 75), but Ingenuity has failed to produce such a document. Mr. Walmsley was unable to remember any new target numbers specifically and testified that the contract's target numbers were turned into "some floating number[s] that [were] never specified." (Id. at 122).

22, 2008, Linshell sent Ingenuity a termination notice, stating that orders from Ingenuity had been "extremely disappointing." (Ex. D to Compl., Doc. 2, at 73-74).  One day earlier, on August 21, 2008, Linshell had entered into a distribution agreement with Conair.  (Ex. C to Diamond Aff., Doc. 230-1, at 21).  According to Conair and Linshell, Linshell had approached Conair directly a few months before, in June 2008, about becoming a distributor. (Diamond Aff. ¶ 8; Walker Dep. at 378). Ingenuity argues that Linshell breached the Distribution Agreement by doing so, but Linshell asserts that the Distribution Agreement was already in its non-exclusive stage at that point.

Ingenuity initially sued Linshell and Conair in state court (Compl., Doc. 2), but Conair removed the case to federal court based on diversity jurisdiction (Doc. 1).   Ingenuity brought various state statutory and tort claims; some of these claims have been dismissed under previous orders.  (See Docs. 33 & 34).  Linshell is currently undergoing liquidation proceedings in the United Kingdom, and a default has been entered against Linshell for this reason. (Order, Docs. 205 & 207).  The only claims surviving against Conair are claims for tortious interference with a contract (Count I), tortious interference with business relationships (Count II), and breach of the non-disclosure contract (Count III).  (Compl. ¶¶ 55-74).  Conair has filed a motion for summary judgment (Doc. 221), arguing that none of these three claims survive.  Ingenuity has also filed a motion for partial summary judgment as to the value of Ingenuity. (Doc. 223).  Because, after considering the filings by both parties, I conclude that Conair's motion for summary judgment must be granted, I will deny Ingenuity's motion for partial summary judgment as moot.

## II.    Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). That burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

In ruling on a motion for summary judgment, a court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, and it may not weigh evidence or determine credibility. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion

for summary judgment."). "[D]iscredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion.  Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." Liberty Lobby, Inc., 477 U.S. at 256-57 (alteration in original) (quotation omitted).

## III.    Tortious Interference Claims

Ingenuity has sued Conair for tortious interference with the Distribution Agreement (Count I) and tortious interference with Ingenuity's business relationships with retailers (Count II).  Except for requiring a contract rather than only a business relationship, the cause of action of tortious interference with a contract is essentially the same as tortious interference with a business relationship. Pilkington v. United Airlines, Inc., 112 F.3d 1532, 1540 (11th Cir. 1997); see also Smith v. Ocean State Bank, 335 So. 2d 641, 642 (Fla. 1st DCA 1976). "The elements of tortious interference with a business relationship are '(1) the existence of a business relationship . . . (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994) (alteration in original) (quoting Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985)); accord Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1154 (11th Cir. 2001).[3] "[E]mbedded within the essential elements of the tort of intentional interference

---

[3] I apply Florida law in this case because jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.  (See Notice of Removal, Doc. 1).  While sitting in diversity, federal courts must apply substantive state law. See Erie R. Co. v. Tompkins,

with a business relationship is the legal requirement that the plaintiff prove causation." <u>St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.</u>, 784 So. 2d 500, 504 (Fla. 5th DCA 2001).

### A.    Tortious Interference with a Contract

In Count I, Ingenuity alleges that Conair tortiously interfered with Ingenuity and Linshell's contract.    Conair does not dispute the first two elements of the tortious interference analysis, and it is clear from the record that Conair knew about a contract between Ingenuity and Linshell.  Conair argues, however, that Ingenuity has not shown proof of the third element—that Conair intentionally interfered with the contract.

"The law in Florida is clear that '[t]here is no such thing as a cause of action for interference [with a contractual or advantageous business relationship] which is only negligently or consequentially effected.'" <u>Fla. Power & Light Co. v. Fleitas</u>, 488 So. 2d 148, 151 (Fla. 3d DCA 1986) (alterations in original) (quoting <u>Ethyl Corp. v. Balter</u>, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980)).  "Florida courts have held that the plaintiff must plead and prove that the defendant manifested a specific intent to interfere with the business relationship." <u>Chi. Title Ins. Co. v. Alday-Donalson Title Co. of Fla., Inc.</u>, 832 So. 2d 810, 814 (Fla. 2d DCA 2002).  In other words, "[t]he existence of malice is key to the tort of tortious interference with a business relationship." <u>Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.</u>, 779 So. 2d 554, 557 (Fla. 5th DCA 2001).  However, "[t]hough a showing of malice or ill will is necessary, there is no requirement that the interference was intended to secure a business advantage over the plaintiff." <u>Id.</u>  Additionally, "'[o]ne

---

304 U.S. 64 (1938); <u>Bravo v. United States</u>, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam).

8

does not induce another to commit a breach of contract with a third person . . . when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.'" Fiberglass Coatings, Inc. v. Interstate Chem., Inc., 16 So. 3d 836, 838 (Fla. 2d DCA 2009) (quoting Martin Petroleum Corp. v. Amerada Hess Corp., 769 So. 2d 1105, 1107 (Fla. 4th DCA 2000)).

Ingenuity has not shown that Conair had the specific intent to interfere with the contract between Ingenuity and Linshell.  Though Conair knew about the contractual relationship between Ingenuity and Linshell, testimony from officers of both Conair and Linshell indicates that when Linshell approached Conair, Conair directly asked about Ingenuity and was told by Linshell representatives multiple times that its contract with Ingenuity was at that point non-exclusive and soon to expire. (Diamond Aff. ¶¶ 9-12 & Ex. A to Aff., Doc. 230-1, at 12; Resp. to Req. for Admiss., Doc. 230-3; Req. for Admiss., Doc. 230-2, ¶¶ 25-31).

Instead of putting forth evidence to contradict Conair's claims, Ingenuity only argues that the court should allow the factfinder to draw inferences of Conair's intent. (See Doc. 237 at 7).  Ingenuity contends that "Conair's assertions of innocence are incredible" because when Conair received conflicting information about the contract between Ingenuity and Linshell, "Conair didn't lift a single finger to sort out the conflict." (Id. at 8). As noted by the Supreme Court in Anderson v. Liberty Lobby, however, discrediting testimony does not suffice to defeat a motion for summary judgment when the plaintiff has had the opportunity to conduct full discovery and present affirmative evidence, as Ingenuity has here. 477 U.S. at 256-57. And, while the allegation that Conair did not attempt to sort out the conflict may speak to negligent conduct by Conair, it does not address whether

9

Conair had the specific intent to induce a breach of the contract.  As mentioned above, negligent conduct alone is insufficient to establish a claim for tortious interference with a contract, and Ingenuity has not put forth any evidence indicating that Conair's conduct was anything more than negligent.

Even if Ingenuity had been able to prove specific intent, Conair's argument that Linshell was already predisposed to terminate the Distribution Agreement with Ingenuity is well-taken.  If a party already intends to breach a contract regardless of the alleged interferer, the plaintiff will be unable to establish that the interferer caused the breach. Mortg. Now, Inc. v. Guaranteed Home Mortg. Co., Inc., No. 12-15499, 2013 WL 5677029, at *2 (11th Cir. 2013); Chi. Title Ins. Co., 832 So. 2d at 814; Farah v. Canada, 740 So. 2d 560, 562 (Fla. 5th DCA 1999). The record evidence indicates that Linshell was dissatisfied with Ingenuity's performance under the contract and was actively seeking other potential distributors. (See, e.g., Termination Letter, Ex. D to Compl., at 73-74; Walker Dep. at 397-402; Diamond Aff. ¶ 8). Regardless of whether Linshell was justified in terminating the contract with Ingenuity, the evidence shows that it was predisposed to do so with or without Conair.  Ingenuity has thus failed to identify evidence that indicates any interference by Conair caused Linshell's alleged breach of the contract.

For these reasons, Ingenuity has failed to show that Conair tortiously interfered with the contract between Ingenuity and Linshell or induced Linshell to breach the contract. Summary judgment on Count I must be granted.

### B.    Tortious Interference with Business Relationships

In Count II, Ingenuity claims that Conair tortiously interfered with Ingenuity's business relationships with retailers.  As to this count, Conair again argues that it did not have the specific intent to interfere with Ingenuity's business relationships and that Linshell

was already predisposed to terminate the Distribution Agreement it had with Ingenuity. (Doc. 221 at 13-16).  In addition, Conair argues that Ingenuity cannot recover on this count because it had no future expectation of distributing the Linziclip to retailers and because Conair had an economic privilege to sell the Linziclip to retailers.  (Id. at 16-18).

I agree that Ingenuity has not shown that Conair had the intent to interfere with Ingenuity's business relationships. As stated above, Linshell represented to Conair that Ingenuity no longer had an exclusive right to distribute the Linziclip to retailers and that in fact all rights of Ingenuity to distribute the Linziclip were quickly coming to an end.  After Linshell contracted with Conair to be its new distributor, Conair was required by the contract to contact retailers to begin relationships with them. (See Conair Distribution Agreement, Doc. 230-1, at 29 § 2.1).  Other than arguing, as in Count I, that the Court should allow the jury to infer Conair's intent, Ingenuity points to no additional evidence, and makes no argument in its response, that indicates Conair contacted the retailers out of an intent to interfere with Linshell's relationships with distributors. (See Doc. 237).  Due to this lack of evidence, there is no genuine dispute of material fact as to the intent of Conair, and Conair's motion for summary judgment must be granted.

In addition, Ingenuity cannot recover on this count because Linshell was predisposed to terminate its contract with Ingenuity, thus precluding those relationships. Regarding this issue, Conair argues that "Ingenuity's relationships with the retailers necessarily flowed from its rights under" the distribution agreement and that when Linshell terminated the agreement, "Ingenuity's relationships with the retailers necessarily had to end." (Doc. 221 at 15).  Ingenuity does not respond to this argument, (see Doc. 237), and Conair's point is well-taken.  Ingenuity's allegations regarding a tortious interference with

its business relationships with retailers relate only to the relationships it had as a result of being the exclusive Linziclip distributor. (See Compl. ¶¶ 64-69). Linshell's predisposition to terminating the contract would have prevented Ingenuity from continuing its relationships in that capacity with retailers, regardless of any actions by Conair.

Conair also argues that Count II must fail because it had an economic privilege to sell the Linziclip to retailers. (Doc. 221 ¶¶ 37-38). Ingenuity responds, without citing any authority, that if Conair lacked a legal right to enter into a contract with Linshell, it "had no privilege to sell to Ingenuity's retailers." (Doc. 237 at 10). "'There can be no claim [for tortious interference with a business relationship] where the action complained of is undertaken to safeguard or promote one's financial or economic interest.'" Barco Holdings, LLC v. Terminal Inv. Corp., 967 So. 2d 281, 293 (Fla. 3d DCA 2007) (alteration in original) (citing Genet Co. v. Annheuser-Busch, Inc., 498 So. 2d 683, 684 (Fla. 3d DCA 1986)). This is true even if there is evidence that the action was undertaken with malice or ill-will as well. Alexis v. Ventura, 66 So. 3d 986, 988 (Fla. 3d DCA 2011); McCurdy v. Collis, 508 So. 2d 380, 383 (Fla. 1st DCA 1987). "However, where a defendant has no prior economic interest of his own to safeguard but only a prospective business advantage that is not yet realized, the defendant has no such privilege to interfere with an existing contract." Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc., 418 So. 2d 1074, 1077 (Fla. 5th DCA 1982).

Conair's actions in contacting retailers was clearly done to safeguard its interests under its new distribution agreement with Linshell. Whether or not Linshell's termination of the Distribution Agreement with Ingenuity was wrongful is not relevant to Conair's actions in this case. As discussed above, Conair had reason to believe that Linshell's agreement with Ingenuity at that time was non-exclusive and soon to terminate, and from Conair's

perspective, it had entered into a valid contract.   Its actions in contacting retailers were done in furtherance of its rights and obligations under that contract.   For this reason, it had an economic privilege to contact the retailers, and it cannot be held liable for tortious interference.

Finally, Conair argues that it cannot be held liable under Count II because Ingenuity had no future expectation of distributing the Linziclip to retailers.   (Doc. 221 at 16-17).   In Florida, a successful tortious interference claim cannot be predicated on interference with a relationship that "is based on speculation regarding future sales to past customers." Ethan Allen, 647 So. 2d at 815.   However, Florida courts recognize a distinction "between a relationship with the community at large and with an identifiable customer," and have provided protection under tortious interference claims for past relationships with specific, identifiable customers.   Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1156 (11th Cir. 2001).

Ingenuity does not directly address this argument in its response.   (See Doc. 237). Instead, Ingenuity identifies in the Complaint particular retailers that it "had existing business relationships with . . . [and] to whom it distributed Linziclips," (Compl. ¶ 65), and argues that it had the unconditional right to distribute the Linziclip under the Distribution Agreement, (Doc. 237 at 2).   Because this area of state law "is lacking in clarity," I do not decide whether Ingenuity had a relationship with the retailers sufficient to succeed on a tortious interference claim.   See Int'l Sales & Serv., Inc., 262 F.3d at 1158 (declining to decide whether the parties had a "business relationship" in a tortious interference case because state law was unclear and because the case failed for other reasons).   For the

reasons set forth above, however, I find that summary judgment must be granted on Count II.

## IV.   Breach of Contract Claim

"The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2d DCA 2006) (citing Knowles v. C.I.T. Corp., 346 So. 2d 1042, 1043 (Fla 1st DCA 1977)). "[I]n order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." Id. "A plaintiff can receive compensatory or actual damages for the loss or injury caused by the action of the defendant. . . . A plaintiff, however, is not entitled to recover compensatory damages in excess of the amount which represents the loss actually inflicted by the action of the defendant." MCI Worldcom Network Servs., Inc. v. Mastec, Inc., 995 So. 2d 221, 223 (Fla. 2008) (citations omitted).

Conair does not dispute that it entered into a contract with Ingenuity in the form of the non-disclosure agreement.  Conair does, however, argue that Ingenuity has not submitted proof that Conair breached the contract by actually misusing any confidential information obtained from Ingenuity. (Doc. 221 at 22-25).  Ingenuity responds that "[n]o reasonable person could conclude Linshell and Conair, in discussions purposely kept secret from Ingenuity, could have formed a new Distribution Agreement to take over Ingenuity's key territory for the Linziclip, without sharing Ingenuity's confidential business information." (Doc. 237 at 7).  Mr. Walmsley testified in his deposition that Ingenuity gave Conair confidential information.  (See Walmsley Dep. II at 276-346).  However, even if I assume that Conair was in possession of confidential information under the terms of the contract, Ingenuity submitted no proof that would indicate that Conair used any such

information in a manner contrary to the non-disclosure agreement. In effect, Ingenuity argues only that Conair must have shared the information since it signed a new distribution agreement with Linshell (see Doc. 237); this assertion is insufficient to prove a breach. Because of Ingenuity's failure to submit any evidence on this issue, summary judgment must be granted for Conair.

Assuming the contract had been breached, Conair argues that Ingenuity has failed to establish that any breach proximately caused Ingenuity's alleged damages. (Doc. 221 at 18-22). In a breach of contract case, the plaintiff "bears the burden to prove both that it sustained a loss and that 'its lost profits were a direct result of'" the defendant's breaches. Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1243 (11th Cir. 2009) (quoting Whitby v. Infinity Radio Inc., 951 So. 2d 890, 898 (Fla. 4th DCA 2007)). "[C]ausation must be proved with reasonable certainty." Id. (quotation omitted). Here, Ingenuity's arguments regarding causation are directed toward its claims about Conair's alleged tortious interference, which I have already established do not survive summary judgment. Ingenuity puts forth no argument and points to no evidence that would establish that any alleged breach of the non-disclosure agreement by Conair caused Ingenuity's purported damages. For this reason, summary judgment in favor of Conair must be granted.

## V.   Conclusion

There is no genuine dispute of material fact on any of the counts against Conair that remain. Accordingly, it is **HEREBY ORDERED AND ADJUDGED** that:

1.   Conair's motion for summary judgment (Doc. 221) is **GRANTED**.

2.   Ingenuity's motion for partial summary judgment as to the value of Ingenuity (Doc. 223) is **DENIED AS MOOT**.

3.      Conair's motion for miscellaneous relief (Doc. 222) and the parties' outstanding motions in limine (Docs. 250, 251, & 253) are **DENIED AS MOOT**.

4.      Counsel for Ingenuity and Conair **shall appear telephonically** before the undersigned on Thursday, March 27, 2014, at 2:30 p.m., for a hearing with regard to Linshell's default.   On or before 12:00 p.m. on March 27, 2014, counsel shall call the courtroom deputy clerk at 407-835-4304 to advise her of the telephone number at which counsel can be reached for the hearing.

**DONE** and **ORDERED** in Orlando, Florida on March 25, 2014.

Copies furnished to:

Counsel of Record

JOHN ANTOON II
United States District Judge